UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HERBERT E. ROBERTSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-01193-JMS-CSW |
| | ) | |
| WEXFORD OF INDIANA, LLC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT AND DIRECTING FURTHER PROCEEDINGS**

Plaintiff Herbert Robertson, who is incarcerated by the Indiana Department of Correction

("IDOC"), alleges in this lawsuit that he was denied necessary medical care for back and leg pain

when he was at Pendleton Correctional Facility ("Pendleton"). Before the Court are the motions

for summary judgment filed by Centurion Health of Indiana, LLC, Lisa Hamblen, Carl Kuenzi,

Duan Pierce, Missy Bagienski, Elizabeth Hale, John Mershon, and Angie Reynolds ("the

Centurion Defendants") and Martial Knieser, Adonish Mukona, Sheri Wilson, and Wexford of

Indiana LLC ("the Wexford Defendants").[1] For the reasons that follow, these motions are

**GRANTED IN PART AND DENIED IN PART**.

**I.**
**Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment,

the Court views the record and draws all reasonable inferences from it in the light most favorable

---

[1] The motions for summary judgment filed by defendants Dennis Reagle and Sheriff Agboola have already
been granted. Dkt. 209, 210.

to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

Finally, Mr. Robertson has filed surreplies to the defendants' motions for summary judgment. Dkt. 182, 206. This Court's Local Rules permit surreplies "only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response" and provides that the surreply "must be limited to the new evidence and objections." Because Mr. Robertson's surreplies are not filed in response to new evidence or objections in the defendants' motions for summary judgment, they have not been considered.[2]

---

[2] As to the surreply filed at docket 186, in which Mr. Robertson points out that Ms. Wilson was a Physician's Assistant, not a Nurse Practitioner, as argued in the Wexford Defendants' reply, the Wexford Defendants have been permitted to amend their reply to make that correction. Dkt. 199, 204.

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Robertson and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A.  The Parties

Mr. Robertson was incarcerated at Pendleton during the time of the incidents at issue. Dkt. 157-3 at 3 (Robertson Dep. p. 9).

Martial Knieser worked for Wexford of Indiana as a doctor at Pendleton from March 2, 2020, through June 30, 2021. Dkt. 157-1 ¶ 2 (Knieser Aff.).

Sheri Wilson worked for Wexford as a physician's assistant (PA) at Pendleton from February 11, 2019, through June 9, 2021. Dkt. 157-2 ¶ 2 (Wilson Aff.) As a physician's assistant, PA Wilson saw and provided clinical services to the inmates. *Id.* ¶ 3. Although she would sometimes see patients for acute care needs, she most often was responsible for seeing patients and managing their chronic care conditions. *Id.*

Adoniah Mukona, D.P.T., is a licensed physical therapist. Dkt. 157-4 at 1 (Mukona Interrogatory Responses). As a physical therapist, Dr.[3] Mukona could only make recommendations for interventions, but needed specific authority to conduct individualized appointments or to prescribe any treatment beyond home exercise plans. *Id*. at 3. Any intervention requested would require physician approval. *Id.* at 3.

Dr. John Mershon, Dr. Carl Kuenzli, and Dr. Duan Pierce worked as doctors at Pendleton. *See* dkt. 152-3 ¶ 3, 10, 15 (Mershon Aff.).

---

[3] The Court understands this defendant to be a doctor of physical therapy and therefore refers to him as Dr.

Elizabeth Hale worked as a Nurse Practitioner. Dkt. 152-4 ¶ 3 (Hale Aff.). Melissa Bagienski LPN and Angie Reynolds worked as nurses. *See* dkt. 152-3 ¶ 35; dkt. 15 at 19-22. Lisa Hamblen was the Health Services Administrator.

### B. Mr. Robertson's Medical Care

#### 1. Fall on February 7, 2021

Mr. Robertson fell on February 7, 2021. Dkt. 157-3 at 6 (Robertson Dep. at 20). He was taken to the healthcare unit and assessed by a nurse. *Id.* (Robertson Dep. at 21); dkt. 157-7 at 1-2 (Medical Records). The nurse noted that Mr. Robertson complained of cramping and pain shooting down his right leg and that he had a history of sciatica. Dkt. 157-7 at 1-2. The nurse further noted that the "on call provider" ordered an injection of Toradol. *Id.* Mr. Robertson recalls that he was told that the nurse contacted PA Wilson. Dkt. 157-3 at 6 (Robertson Dep. at 21). But PA Wilson does not recall if she was the on-call provider on this date. Dkt. 157-2 ¶ 5. Mr. Robertson believed that he was supposed to be seen by PA Wilson the following day but was not. *Id.* at 23. PA Wilson states that, in a situation like this, it would have been appropriate for Mr. Robertson to be scheduled for a follow-up visit, or to submit a written Healthcare Request Form ("HCRF") if he had any ongoing symptoms. Dkt. 157-2 ¶ 5. She would only have seen Mr. Robertson if he had been placed on her schedule by nursing or other staff. *Id.* ¶ 12. Although Mr. Robertson did submit HCRFs, he was not placed on her schedule, but she took no steps to prevent him from being scheduled. *Id.* ¶ 11-12.

Dr. Knieser saw Mr. Robertson on February 22, 2021, for a complaint of chest pain. Dkt. 157-1 ¶ 4; dkt. 157-7 at 3-5. Mr. Robertson's vital signs were normal, other than a slight elevation of his blood pressure. Dkt. 157-1 ¶ 4. On examination, the only finding was prostate inflammation, and Dr. Knieser ordered Cephalexin. *Id.*

4

### 2. Spring of 2021

Mr. Robertson saw PA Wilson on March 23 for a chronic care visit where they discussed hypertension, hyperlipidemia, and his thyroid. Dkt. 157-7 at 6-9. Mr. Robertson also reported back pain and joint swelling, specifically some burning or prickling sensations in his legs. *Id.* PA Wilson had him roll up his pant leg and assessed his leg and walk during the visit. Dkt. 157-3 at 13 (Robertson Dep. at 49). Mr. Robertson asked for crutches or a bottom range pass. *Id.* (Robertson Dep. at 50). PA Wilson's assessment was potentially paresthesia,[4] and she ordered an x-ray of the lumbar spine. Dkt. 157-7 at 6-9.

On April 20, 2021, PA Wilson reviewed Mr. Robertson's medical chart, after nursing staff brought an HCRF to her attention in which he had requested the status of his x-ray. Dkt. 157-2 ¶ 8; dkt. 157-7 at 10. The x-ray showed no signs of any acute fracture, dislocation, or any degenerative changes. Dkt. 157-7 at 10. Therefore, PA Wilson wrote out this response and it was provided to Mr. Robertson, and she also made an entry in the electronic medical records. Dkt. 157-2 ¶ 8; dkt. 157-7 at 10.[5]

Mr. Robertson was supposed to see PA Wilson again on April 27, but the medical records indicate that he refused this visit. *See* dkt. 157-7 at 11, 19. The refusal form is signed by an EMT and correctional officer. *Id.* at 19. Mr. Robertson testified that he did not refuse medical treatment that day. Dkt. 157-3 at 14 (Robertson Dep. at 53). Mr. Robertson believes that the officers who escorted him to medical were asked by PA Wilson to sign a refusal. *Id.* Mr. Robertson filed a

---

[4] "Paresthesia is the feeling of tingling, numbness or 'pins and needles.'" Cleveland Clinic, *Paresthesia*, https://my.clevelandclinic.org/health/symptoms/24932-paresthesia (visited Mar. 3, 2025).

[5] Mr. Robertson argues in his response that PA Wilson "lied" by saying in a health care response that his x-rays were normal, when he had yet to receive a lumbar x-ray, which was ordered later. The records, however, show that PA Wilson had Mr. Robertson's recent knee x-ray, and was indicating that his knee x-ray was normal.

grievance about this appointment and the response to the grievance states that Mr. Robertson did not specifically refuse his medical appointment but was at recreation. Dkt. 157-6 at 1 (Grievance Records). The correctional officer explained that his signature on a refusal form indicating that Mr. Robertson refused to be seen by medical that day was a mistake. *Id.* at 2. PA Wilson left her employment at Pendleton a few weeks later and had no further interactions with Mr. Robertson. Dkt. 157-2 ¶ 10. [6]

Dr. Knieser saw Mr. Robertson on May 11, 2021, after Mr. Robertson had presented to healthcare staff complaining of ongoing knee pain. Dkt. 157-1 ¶ 6; dkt. 157-7 at 12-14. Mr. Robertson told Dr. Knieser he had back pain and knee pain and that his pain was so severe it woke him up. Dkt. 15 at 9. On exam, Dr. Knieser noted right patellar apprehension, with moderate pain during range of motion examination. Dkt. 157-7 at 12-14. Dr. Knieser diagnosed patellar bursitis and recommended that Mr. Robertson use ice to alleviate swelling to the knee and perform range of motion exercises. *Id.* Dr. Knieser also noted that, because of his complaints of discomfort, Mr. Robertson could use a wheelchair if he is moved and ordered naproxen for 14 days. *Id.* Dr. Knieser explains that his examination was more consistent with bursitis, which did not require an orthopedic consultation or surgical intervention. Dkt. 157-1 ¶ 10. Dr. Knieser planned to progress treatment based upon whether Mr. Robertson's condition responded to the intervention, or any other changes. *Id.* Mr. Robertson testified that Dr. Knieser told him he needed a bottom range pass, that his thigh was severely swollen, and that he would order pain medication and would follow up with him in two weeks. Dkt. 157-3 at 7 (Robertson Dep. at 24).

---

[6] Mr. Robertson asserts in his response to the motion for summary judgment that, in June of 2021, when she was visiting the range, PA Wilson used a racial slur against him. Dkt. 175 at 16. But he does not designate any admissible evidence to support this contention.

Mr. Robertson saw a nurse about a week and a half later, on May 22, and told her that he had fallen and was in pain. Dkt. 185-1 at 31-33. The nurse noted that an ace wrap was applied to his knee, he was given naproxen, and she would refer him to the doctor. *Id.* Mr. Robertson submitted another HCRF on May 26 complaining of the fall and asking to see Dr. Knieser again. Dkt. 177 at 21. On June 4, 2021, non-party Nurse Allysa Karlson provided Mr. Robertson ice for his pain. Dkt. 177 at 162. Mr. Robertson then submitted more HCRFs seeking to see the doctor for his pain. Dkt. 177 at 35-37.

### 3. Summer of 2021

Mr. Robertson next saw Dr. Knieser on June 29. Dkt. 157-1 ¶ 6; dkt. 157-7 at 15-17. Dr. Knieser told Mr. Robertson that he had gotten his HCRFs and had been notified electronically on June 2. Dkt. 157-3 at 16 (Robertson Dep. 62). Dr. Knieser again noted some tenderness over the right knee and moderate pain with motion. Dkt. 157-7 at 15-17. He also told Mr. Robertson he had a severe back injury and that he would request an MRI and orthopedic consult and make sure he was moved to the bottom range. Dkt. 15 at 11; dkt. 157-3 at 16 (Robertson Dep. at 62). Dr. Knieser concluded at this appointment that his symptoms were more consistent with a potential meniscus injury and ordered acetaminophen and x-rays. Dkt. 157-1 ¶ 10; dkt. 157-7 at 15-17. The next day was Dr. Knieser's last day working at Pendleton. Dkt. 157-1 ¶ 8.

Mr. Robertson had x-rays of his lumbar spine on July 8, 2021. Dkt. 185-1 at 21. The radiologist noted:

FINDINGS: 5 lumbar vertebral bodies are identified and appear in anatomic alignment there is mild diffuse disc space narrowing. There is mild multilevel marginal osteophyte formation. Vertebral bodies maintain normal height. Facet joints are unremarkable. There is no acute fracture or subluxation. No destructive osseous lesions. Spinous and transverse processes and pedicles appear intact. Sacroiliac joints appear symmetric.

IMPRESSION: Mild diffuse disc degeneration without acute osseous abnormality.

Signature Daniel J Altman

*Id.*

Dr. Kuenzli saw Mr. Robertson on July 20, 2021. Dkt. 152-1 at 2-4. Dr. Kuenzli noted that Mr. Robertson had injured his leg on February 7, 2021, re-injured the leg two months later, and also re-injured the leg in June 2021. *Id.* Dr. Kuenzli examined Mr. Robertson and noted decreased extension and flexion, as well as tender thigh muscles, and joint pain. *Id.* Dr. Kuenzli planned to evaluate hip and spinal X-rays and to start Aleve/Naproxen for pain. *Id.* Mr. Robertson contends that he didn't receive any pain medicine, but the medication administration record he references indicates that he was receiving 500 mg of Tylenol twice a day. Dkt. 185-1 at 15.

Mr. Robertson had x-rays of his right leg the next day. Dkt. 152-1 at 7.[7] He also saw a nurse that day after reporting a fall, who noted that Mr. Robertson's right knee was bruised and swelling slightly. *Id.* at 5.

Mr. Robertson submitted an HCRF on August 2, 2021, complaining that his pain was getting worse, that Dr. Kuenzli's medication order was denied, and asking for a cane. Dkt. 152-2 at 13. Ms. Hamblen responded that canes are not allowed in the segregation units. *Id.*

Dr. Pierce saw Mr. Robertson on August 17 for his knee pain. *Id.* at 12-14. Mr. Robertson reported throbbing and aching pain associated with joint instability and weakness and requested

---

[7] Mr. Robertson argues that Dr. Kuenzli never ordered hip and spine x-rays, dkt. 184 at 4, but Mr. Robertson did undergo lower leg and thigh x-rays on the day after his July 20 appointment. Dkt. 152-1 at 7.

an MRI. *Id.* Dr. Pierce noted that the x-ray showed no sign of acute injury or degenerative changes. *Id.* He also performed a physical examination and noted that pain with even light touch over the lateral knee was out of proportion to the exam. *Id.* Dr. Pierce concluded that physical therapy would be appropriate and that an MRI was not indicated at that time because there was no evidence of swelling in the knee. *Id.* He prescribed Mobic[8] 7.5 mg for pain and planned to evaluate Mr. Robertson after physical therapy. *Id.*

Dr. Pierce saw Mr. Robertson again on September 7 and noted that a recent infection of the left leg was resolved through antibiotics. *Id.* at 24-26. Dr. Pierce noted that there was no recent history of a fall, and that Mr. Robertson complained of right leg numbness and swelling in the foot. *Id.* Dr. Pierce examined Mr. Robertson and noted that the right leg appeared normal. *Id.* He also reviewed Mr. Robertson's x-rays, which were normal, noted that Mr. Robertson was on Mobic, and that he was referred to physical therapy. *Id.* Dr. Pierce noted that he would follow up after he was seen by physical therapy. *Id.*

Dr. Mukona, the physical therapist, saw Mr. Robertson on September 20. *Id.* at 31-32. He noted right knee pain and severe upper right leg muscle atrophy and requested that Mr. Robertson be issued a pair of crutches. *Id.* Mr. Robertson contends that Dr. Mukona told him that he should have been treated for his injuries "months ago." Dkt. 15 at 13. Mr. Robertson submitted an HCRF that day requesting his crutches. Dkt. 152-2 at 30. The response indicated that Mr. Robertson would receive the crutches in due course. *Id.* On September 21, 2021, Dr. Pierce issued Mr. Robertson a crutch pass that was valid between September 21, 2021, and October 5, 2021. Dkt. 152-2 at 29.

---

[8] Mobic is also known as Meloxicam. Drugs.com, *Mobic*, https://www.drugs.com/mobic.html (last visited Mar. 3, 2025).

Mr. Robertson filed an emergency medical grievance on September 22, complaining that he had not yet received his crutches. Dkt. 145-5 at 22 (Grievances). The grievance was forwarded to HSA Lisa Hamblen to investigate. *Id.* at 21. Ms. Hamblen conferred with Dr. Pierce regarding whether the crutches were medically necessary considering the institutional safety and security concerns. *Id.* Ms. Hamblen cautioned that such access could be dangerous given the potential for crutches to be used as a weapon, Mr. Robertson's history of violence, and his placement in G-Cellhouse where such medical devices are generally banned because G-House is primarily comprised of violent offenders. *Id.* at 17, 21. Dr. Pierce clarified that Mr. Robertson did not require constant use of mobility assistance and the crutches were only intended to improve his movement when walking without other forms of assistance. Dkt. 145-2 at 2, 5. On September 26, 2021, Mr. Robertson submitted an additional HCRF requesting his crutches. Dkt. 152-2 at 33. The response indicated that no crutches were allowed in Mr. Robertson's housing unit. *Id.*

### 4. Fall of 2021

Mr. Robertson met with Dr. Mukona the next day for physical therapy. Dkt. 152-1 at 36. He reported falling as well as pain in his right thigh and right knee. *Id.* Dr. Mukona requested a physician consultation for a prescription of Mobic or Voltaren cream for pain management. *Id.*

On October 6, 2021, Mr. Robertson was seen in nursing for a complaint of a fall. Dkt. 152-1 at 39-40. He asked for crutches and the nurse noted that he had an order for a knee brace. *Id.* 23. On October 12, 2021, Mr. Robertson missed his appointment with NP Hale because he was outside participating in recreation. *Id.* at 42.

On October 19, 2021, NP Hale saw Mr. Robertson for a provider visit and noted that Mr. Robertson reported continued pain in his right leg and repeated falls which were not witnessed. *Id.* at 43-46. NP Hale did not see the need for additional imaging at the time, and instructed Mr.

Robertson to continue his home exercise plan as instructed by physical therapy. *Id.* at 48-51. She also noted that he reported falling once or twice a week, but that these falls were not observed. *Id.* NP Hale determined that Mr. Robertson was likely experiencing strain and weakness due to age. *Id.* She could not find the orders or evaluation by physical therapy at the time and she re-referred him to physical therapy. *Id.* Mr. Robertson asked NP Hale for pain medication and she told him "we will see if they are approved, they are expensive medications." Dkt. 15 ¶ 71. She discontinued his Naprosyn and requested Mobic 7.5 mg, a follow-up with physical therapy, and noted that Mr. Robertson would follow up with a provider once he completed his physical therapy treatment. Dkt. 152-1 at 48-51. Although NP Hale noted that Mr. Robertson told her that his back was fine, he says he told her his back was hurting. Dkt. 185-1 at 19.

### 5. Mobic Prescription Issues in Late 2021

Mobic/Meloxicam became a formulary drug on October 15, 2021. Dkt. 152-3 ¶ 30. Nonetheless, on October 19, 2021, NP Hale submitted a Formulary Exception Request ("FER") order for Meloxicam/Mobic 7.5 mg to the pharmacy for 180 days. Dkt. 152-1 at 47.[9] A FER is a provider request for a medication that is not listed on the IDOC Formulary List, which is a list of pre-approved medications to treat certain conditions. Dkt. 152-4 ¶ 22. NP Hale explains that her submission of a FER was due to an abundance of caution to best ensure that Mr. Robertson received his medication from the pharmacy. *Id.* ¶ 21. A non-formulary drug must be approved through a FER before it can be filled by the pharmacy and provided to the patient. *Id.* It is NP Hale's understanding that the pharmacy inadvertently did not fill the order for Meloxicam/Mobic despite it being a formulary drug. *Id.* ¶ 24. Dr. Mershon explains that it would exceed the scope of

---

[9] Mr. Robertson points out that this form is not signed.

NP Hale's role as a nurse practitioner to approve a FER or fill an order for a prescription. Dkt. 152-3 ¶ 33.

Mr. Robertson submitted an HCRF on October 25, 2021, complaining of pain and asking for "pain medicine." Dkt. 152-2 at 51. Nurse Bagienski[10] responded stating "You will … still get Mobic and will be seen again in a month." *Id.*

Mr. Robertson saw a nurse on October 28, 2021, for a report of falling when his leg fails and buckles. Dkt. 152-1 at 52-54. The nurse referred Mr. Robertson to a provider. *Id.*

Mr. Robertson wrote to Ms. Hamblen on November 20, 2021, stating that he had never received his Mobic as prescribed. Dkt. 185-1 at 129.

On December 4, 2021, Mr. Robertson saw Nurse Bagienski complaining of being sick. *Id.* at 55-56. When he arrived for the nursing visit he complained of pain in his back and was advised to submit another HCRF to be seen for back pain. *Id.*

On December 6, 2021, Mr. Robertson saw Dr. Mukona for physical therapy. *Id.* at 60-63. He reported pain, and Dr. Mukona referred him for further treatment with a physician for pain management. *Id.* Mr. Robertson states that Dr. Mukona told him that he had discussed his MRI and x-rays with Dr. Mershon, told Dr. Mershon he needed help, and had Mr. Robertson escorted to Dr. Mershon's office. Dkt. 185-1 ¶ 7. Dr. Mershon noted that Mr. Robertson was seen by physical therapy, who felt there was nothing more that he could do since home exercises were making Mr. Robertson's symptoms worse. Dkt. 152-1 at 57-59.[11] *Id.* Dr. Mershon noted that he performed a general examination and observed him walking without difficulty as he entered his

---

[10] Mr. Robertson contends that this HCRF was signed by Nurse Bagienski. It's not clear from the signature on the form whether she was the one who signed it, but the defendants do not dispute this fact, so the Court assumes Mr. Robertson is correct.

[11] Mr. Robertson contends that he was suffering back and leg pain. Dkt. 184 at 17.

clinic. *Id.* Dr. Mershon visually observed Mr. Robertson's knees and noted that they appeared normal without swelling or erythema with normal range of motion. *Id.* Mr. Robertson reported to Dr. Mershon that he was not receiving his Mobic and Dr. Mershon indicated that he would look into why he was not receiving the medication. *Id.* Mr. Robertson submitted video of this visit. Dkt. 183. There is no audio, but the Court's review of the video reflects that Mr. Robertson met with Dr. Mershon at his desk and the two engaged in several minutes of discussion. *Id.* Although Dr. Mershon did not physically touch Mr. Robertson's knee, Mr. Robertson did pull up his pant leg and show it to him during this discussion. *Id.* Further, while Dr. Mershon states that he observed Mr. Robertson walking without difficulty, it appears to the Court that Mr. Robertson walked with a very slight limp. *Id.*

Mr. Robertson asked Nurse Reynolds for help with his pain medication. Dkt. 185-1 at 18 (Robertson Aff.). He asserts that Nurse Reynolds told him his Mobic had been denied. Dkt. 184 at 9. He also submitted a HCRF on December 6, asking for a copy of the order for Mobic, and stating that he has asked for 45 days for pain medicine, and that he was told it was denied. Dkt. 152-2 at 72. Nurse Bagienski responded on December 7, "We do not give out any FER's. That is against policy." *Id.*

Between December 6, 2021, and December 20, 2021, Dr. Mershon investigated why Mr. Robertson's Mobic prescription was not being provided to him. Dkt. 152-3 ¶ 38. Dr. Mershon emailed Nurse Bagienski to ask why Mr. Robertson had not received Mobic and Nurse Bagienski responded "He gets in his med pack. He wants it on person and can not have it." Dkt. 185-1 at 152. Dr. Mershon learned that because Mobic was on the IDOC formulary list since October 15, 2021, no FER would be needed for the pharmacy to fill the order and that NP Hale submitted a FER out of an abundance of caution on October 19, 2021. Dkt. 152-3 ¶ 38. Dr. Mershon determined that

Clinical Pharmacy Solutions inadvertently did not fill NP Hale's October 19, 2021, order for Meloxicam 7.5 mg for 180 days between October 19, 2021, and December 20, 2021.[12] *Id.* ¶ 39.

On December 8, 2021, Mr. Robertson submitted a HCRF indicating that he had not received his Meloxicam as NP Hale had ordered. Dkt. 152-2 at 75. Ms. Hamblen responded that the medication had been ordered as of December 20, 2021. *Id.*

It is NP Hale's understanding that the pharmacy mistakenly discontinued the order on December 20, 2021. Dkt. 152-4 ¶ 25. In response, NP Hale placed an additional order for Meloxicam/Mobic 7.5 mg for 180 days for Mr. Robertson on December 20, 2021. *Id.* ¶ 26. It is NP Hale's understanding that the pharmacy sent a ten-day order for Meloxicam/Mobic 7.5 mg on December 20, 2021, and discontinued the order on December 22, 2021. *Id.* ¶ 27. At that point, NP Hale placed an additional order for Meloxicam/Mobic 7.5 mg for 180 days for Mr. Robertson on December 22, 2021. *Id.* ¶ 28. Mr. Robertson acknowledged that he started receiving Meloxicam on or around December 24, 2021. Dkt. 157-3 at 117.

Mr. Robertson's MAR for the months of October through December 2021 demonstrated that the pharmacy did not fill NP Hale's October 19, 2021, order for Meloxicam/Mobic and mistakenly listed the order as "Needs Non-Form Approval." Dkt. 152-4 ¶ 33.

---

[12] Mr. Robertson contends that Dr. Mershon knew that Mobic was a formulary drug and simply chose not to order it but he has so evidence to support an inference regarding Dr. Mershon's state of mind on this point. Dkt. 184 at 18.

**III.**

**Discussion**

Mr. Robertson alleges that the individual defendants were deliberately indifferent to his knee and back issues and that this deliberate indifference resulted from policies of Wexford and Centurion.

### A. Standards

#### 1. Deliberate Indifference

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court assumes for purposes of the summary judgment motion that Mr. Roberson's back and leg pain was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that the defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Robertson]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Mr. Robertson "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

"Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

### 2. Municipal Liability

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution. *Dean*, 18 F.4th at 235 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).

Municipal liability for a § 1983 claim must be premised on actions of the entity—an entity cannot be vicariously liable for actions of its agents or employees. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022). So, to prevail on a 42 U.S.C. § 1983 claim against a private entity acting under color of state law like Centurion, "a plaintiff must ultimately prove three

16

elements: (1) an action pursuant to a [corporate] policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the [company] action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020); *see generally Monell*, 436 U.S. 658. The plaintiff "must show that the policy or custom demonstrates municipal fault." *Bohanon*, 46 F.3d at 675 (citations omitted). "[W]here the policy relied upon is not itself unconstitutional, *considerably more proof than the single incident will be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation. *Dean*, 18 F.4th at 236.

### B. Application

Mr. Robertson's claims against each defendant, including Wexford and Centurion, are discussed separately.

#### 1. Sheri Wilson

The evidence taken in the light most favorable to Mr. Robertson is that PA Wilson interacted with him on several occasions but only saw him once in person. First, when Mr. Robertson fell on February 7, 2021, he was assessed by a nurse in the healthcare unit who noted that the "on call provider" ordered an injection of Toradol. Dkt. 157-3 at 6. Mr. Robertson testifies that he was told that PA Wilson was the on call provider and that she would see him the next day, but he did not see a provider until later. Next, Mr. Robertson saw PA Wilson on March 23 for a chronic care appointment, where he also complained of his leg and back pain and asked for a bottom range pass. Dkt. 157-7 at 6-9; dkt. 157-3 (Robertson Dep. at 49). PA Wilson ordered an x-ray of the lumbar spine. *Id.* PA Wilson performed a chart review on April 20, after nursing staff brought a HCRF from Mr. Robertson asking for the status of a recent x-ray to her attention. Dkt.

157-2 ¶ 14. Finally, Mr. Robertson was supposed to have an appointment with PA Wilson on April 27, but it was mistakenly noted that he refused that appointment.

Among other things, Mr. Robertson argues that he requested that PA Wilson order a bottom bunk pass because of his pain. A reasonable jury believing that Mr. Robertson expressed to PA Wilson that he was experiencing knee and back pain, and she did not provide him one, could conclude that she was deliberately indifferent to his pain. *See Withers v. Wexford Health Sources, Inc.*, 710 F.3d 688 (7th Cir. 2013) (reversing grant of summary judgment for nurse where nurse left inmate suffering from back pain in cell where he was assigned to top bunk, there was no ladder leading to the top bunk, and plaintiff claimed the nurse knew he could not climb to the top bunk). PA Wilson is therefore not entitled to summary judgment.

### 2. Martial Knieser

Dr. Knieser treated Mr. Robertson twice. First, Dr. Knieser saw Mr. Robertson on May 11, 2021, after he presented to healthcare staff complaining of ongoing knee pain. Dkt. 157-1 ¶ 6; dkt. 157-7 at 12-14. Mr. Robertson told Dr. Knieser he had back pain and knee pain and that his pain was so severe it woke him up. Dkt. 15 at 9. Dr. Knieser diagnosed right patellar bursitis and recommended that Mr. Robertson use ice to alleviate swelling and perform range of motion exercises. Dkt. 157-7 at 12-14. Dr. Knieser also noted that Mr. Robertson could use a wheelchair once if he is moved due to his complaints of some discomfort and ordered anti-inflammatory medication. *Id.* Among other things, Mr. Robertson testified that Dr. Knieser told him he needed a bottom range pass, that his thigh was severely swollen, and that he would order pain medication and would follow up with him in two weeks. Dkt. 157-3 at 7 (Robertson Dep. at 24). Mr. Robertson next saw Dr. Knieser on June 29 and Dr. Knieser told him he would order an MRI. Dkt. 15 at 11. Dr. Knieser also entered an order for a low bunk pass. Dkt. 177 at 17.

Although Dr. Knieser didn't deny Mr. Robertson all care, providing him pain medication and eventually a low bunk pass, like with PA Wilson, a reasonable jury could conclude that delaying from his May appointment until the end of June to provide a low bunk pass was the result of deliberate indifference. Dr. Knieser therefore is not entitled to summary judgment.

### 3. Adoniah Mukona

Mr. Robertson saw Dr. Mukona on September 20, 2021, September 27, 2021, and December 6, 2021. Dkt. 157-1 at 31-32. On September 20, 2021, Dr. Mukona recommended crutches, and Dr. Pierce then issued an order for Mr. Robertson to receive them. *Id.* During the next two visits, Dr. Mukona referred Mr. Robertson to the physician to receive pain management. *Id.* at 36, 60-63.

Mr. Robertson contends that Dr. Mukona delayed his physical therapy and he did not see him for 10 weeks. But while there were delays in Mr. Robertson seeing Dr. Mukona, Mr. Robertson has not presented evidence that Dr. Mukona caused those delays. Indeed, Mr. Robertson has designated HCRFs forms reflecting that Dr. Mukona had responded to them and attempted to put him on the schedule for physical therapy. Dkt. 177 at 117-119. Moreover, to the extent Mr. Robertson alleges that Dr. Mukona did not ensure Mr. Robertson received devices as ordered, Dr. Mukona did not have the authority to order care other than exercise plans, but could only make recommendations, other than home exercise plans. Dkt. 157-4 at 3.

In short, when Dr. Mukona saw Mr. Robertson, he provided therapy, referred him to a physician, and recommended treatment. No reasonable jury could conclude that he was deliberately indifferent to Mr. Robertson's serious medical needs. Dr. Mukon is therefore entitled to summary judgment.

### 4. Wexford

Mr. Robertson argues that Wexford had a policy of denying off-site care. But there is no evidence that any Wexford employee sought to provide Mr. Robertson with offsite care or evidence that would allow a jury to conclude that any Wexford employee declined to send Mr. Robertson for outside imaging or treatment because of a Wexford policy. *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (the "policy or practice must be the 'direct cause' or moving force' behind the constitutional violation."). Therefore, Wexford is entitled to summary judgment.

### 5. Elizabeth Hale

Mr. Robertson saw NP Hale once during the relevant time, on October 19, 2021. Dkt. 152-1 at 43-46. She noted that Mr. Robertson reported continued pain in his right leg and repeated falls. *Id.* NP Hale did not see the need for additional imaging at the time, and instructed Mr. Robertson to continue his home exercise plan as instructed by physical therapy. *Id.* She could not find the orders or evaluation by physical therapy at the time and she re-referred him to physical therapy. *Id.* She discontinued his Naprosyn and requested Mobic 7.5 mg, a follow-up with physical therapy, and noted that Mr. Robertson would follow up with a provider once he completed his physical therapy treatment. Dkt. 152-1 at 48-51.

Mr. Robertson states that, although NP Hale noted that his back was fine, he told her it was hurting and that his x-ray showed diffuse degenerative disc disease. Dkt. 184 at 33. Nonetheless, however, it is undisputed that NP Hale did refer Mr. Robertson to physical therapy and order new pain medication for him that day. Dkt. 152-1 at 43-46. Mr. Robertson points out that NP Hale made a FER for Mobic even though Mobic had been made a formulary drug and that he did not receive his Mobic prescription until December. He argues that NP Hale's mistake in submitting an FER contributed to the delay in receiving his medication. But there is no evidence from which a

jury could conclude that NP Hale was personally involved in the pharmacy delay or that the fact that she submitted an FER rather than ordering the Mobic was more than negligence on her part. NP Hale is therefore entitled to summary judgment.

### 6. Carl Kuenzli

Dr. Kuenzli saw Mr. Robertson once, on July 20, 2021. Dkt. 152-1 at 2-4 (Medical Records). Dr. Kuenzli noted Mr. Robertson's leg injuries. *Id.* Dr. Kuenzli examined Mr. Robertson and noted decreased extension and flexion, as well as pain in the thigh and knee. *Id.* Dr. Kuenzli planned to evaluate hip and spinal X-rays and to start Aleve/Naproxen for pain. *Id.* Mr. Robertson contends that he didn't receive any pain medicine, but the medication administration record he references indicates that he was receiving 500 mg of Tylenol twice a day. Dkt. 185-1 at 15. In short, Dr. Kuenzli evaluated Mr. Robertson's condition and ordered testing and pain medication. Mr. Robertson argues that Dr. Kuenzli told him he would order an MRI and request an orthopedic consult because his x-ray was abnormal. Dkt. 15 at 12; dkt. 185-1 at 16-17 (Robertson Declaration). But the fact that Dr. Kuenzli did not do so does not mean he failed to exercise his medical judgment regarding Mr. Robertson's care. There is no evidence from which a jury could conclude that Dr. Kuenzli failed to exercise medical judgment when treating Mr. Robertson. Dr. Kuenzli is therefore entitled to summary judgment.

### 7. Duane Pierce

Dr. Pierce saw Mr. Robertson on August 17 and September 7, 2021. Dkt. 152-1 at 12-14 On August 17, he examined Mr. Robertson and concluded that physical therapy would be appropriate and an MRI was not necessary. Dkt. 152-1 at 12-14. He prescribed Mobic and planned to evaluate Mr. Robertson after physical therapy. *Id.* When he examined Mr. Robertson again on September 7, he reviewed Mr. Robertson's x-rays, noted that Mr. Robertson was on Mobic, and

planned to follow-up after he completed physical therapy. *Id.* at 24-26. Dr. Pierce also issued Mr. Robertson a crutch pass, but when Ms. Hamblen followed up, asking if the crutches were medically necessary given the safety concerns, Dr. Pierce responded that the crutches were only to assist with ambulation and that Mr. Robertson could use other methods for support. Dkt. 145-5 at 17.

Mr. Robertson argues that Dr. Pierce should have ordered an MRI and initially ordered him crutches and took no action for his back issues. But it is undisputed that Dr. Pierce examined Mr. Robertson and ordered medication and physical therapy to treat his conditions. There is no evidence from which a jury could conclude that Dr. Pierce made any decisions that weren't based on his medical judgment. Dr. Pierce is therefore entitled to summary judgment.

### 8. John Mershon

Mr. Robertson saw Mr. Mershon once, on December 6, 2021, after Dr. Mukona referred him, concluding that the physical therapy exercises were not helping Mr. Robertson. Dkt. 152-1 at 57-59. Mr. Robertson states that Dr. Mukona told him that he had discussed his MRI and x-rays with Dr. Mershon, told Dr. Mershon he needed help, and had Mr. Robertson escorted to Dr. Mershon's office. Dkt. 185-1 ¶ 7. Although the video reflects that Dr. Mershon performed a somewhat perfunctory exam that day, it is undisputed that he did investigate the reason Mr. Robertson had not received his Mobic and, because of this, Mr. Robertson did eventually receive it. In other words, Dr. Mershon did not disregard Mr. Robertson's complaints or persist in a course of action that was not working but attempted to get him pain medication. Dr. Mershon is therefore entitled to summary judgment.

### 9. Missy Bagienski, Lisa Hamblen, and Angie Reynolds

Mr. Robertson argues that Nurse Bagienski, Ms. Hamblen, and Nurse Reynolds were responsible for the delay in receiving his Mobic.

It is undisputed that these defendants could not prescribe medication or otherwise order treatment for Mr. Robertson. *See* dkt. 152-3 p 44 (it is outside the scope of a medication administration nurse to prescribe or fill medications). But nurses can be deliberately indifferent "where they knowingly disregard a risk to an inmate's health." *See Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015)

Nurse Bagienski participated in Mr. Robertson's care just a few times and there is no evidence here that would allow a reasonable jury to conclude that Nurse Bagienski was aware that Mr. Robertson was not getting his prescribed medications. First, Mr. Robertson submitted an HCRF on October 25, 2021, complaining of pain and asking for "pain medicine." Dkt. 152-2 at 51. Mr. Robertson did not indicate in that HCRF that he was not getting medication. Nurse Bagienski responded stating "You will … still get Mobic and will be seen again in a month." *Id.* On December 4, 2021, Mr. Robertson saw Nurse Bagienski complaining of being sick. *Id.* at 55-56. When he arrived for the nursing visit he complained of pain in his back and was advised to submit another HCRF for his back pain. *Id.* Mr. Robertson submitted an HCRF on December 6, asking for a copy of the order for Mobic, and stating that he has asked for 45 days for pain medicine, and that he was told it was denied. Dkt. 152-2 at 72. Nurse Bagienski responded on December 7, "We do not give out any FER's. That is against policy." *Id.* In this HCRF, Mr. Robertson indicates that his pain medication was denied and Nurse Bagienski's response reflects that she could not provide him with a copy of that denial. Later, when Dr. Mershon emailed Nurse Bagienski to ask why Mr. Robertson had not received Mobic and Nurse Bagienski responded "He gets in his med pack. He wants it on person and can not have it." Dkt. 185-1 at 152. Although it is undisputed that Mr. Robertson was not getting Mobic at this time, there is insufficient evidence to allow a jury to conclude that Nurse Bagienski's statement here was enough to rise to the level of

deliberate indifference, rather than just a mistake. Finally, Nurse Bagienski indicated in an email in late December that she had not yet received Mr. Robertson's Mobic. Dkt. 185-1 at 153. This, too, does not represent deliberate indifference on her part. Nurse Bagienski is therefore entitled to summary judgment.

Next, Ms. Hamblen responded to HCRFs and grievances regarding Mr. Robertson's medical concerns. Mr. Robertson submitted an HCRF on August 2, 2021, complaining that his pain was getting worse, that Dr. Kuenzli's medication order was denied, and asking for a cane. Dkt. 152-2 at 13. Ms. Hamblen responded that canes are not allowed in the segregation units. *Id.* Mr. Robertson then sent Ms. Hamblen a letter in November of 2021 her that he has never received his medication. Dkt. 185-1 at 129. In addition, Ms. Hamblen responded to a grievance regarding Mr. Robertson's pain stating that he is on Mobic. Dkt. 185-1 at 136. Although a jury might not conclude that Ms. Hamblen did not exhibit deliberate indifference by following policy regarding Mr. Robertson's request for a cane or crutches, a jury might conclude that, when he wrote to her in November of 2021, complaining of not receiving medication that had been prescribed to him, and did nothing, she disregarded his serious medical needs. Ms. Hamblen is therefore not entitled to summary judgment.

Finally, Mr. Robertson argues that he asked Nurse Reynolds for help with his pain medication and she told him his Mobic had been denied Dkt. 185-1 at 18 (Robertson Aff.); dkt. 184 at 9. But Mr. Robertson was being seen regularly for his pain and there is no evidence that Nurse Reynolds could prescribe medication or otherwise order treatment for Mr. Robertson. *See* dkt. 152-3 p 44 (it is outside the scope of a medication administration nurse to prescribe or fill medications). In other words, if Nurse Reynolds was told that Mr. Robertson's Mobic had been denied, there is no evidence that she could have done anything about this denial. There is therefore

no evidence from which a jury could conclude that she disregarded his serious medical needs. She is therefore entitled to summary judgment.

### 10. Centurion

Mr. Robertson argues that Centurion Health of Indiana, LLC, maintained unconstitutional policies, practices, and customs related to delaying care to save money, revolving providers, failing to request needed imaging, and delaying prescription pain medication. Dkt. 184 at 29-30. But Mr. Robertson has designated no evidence to support any of these contentions. First, to the extent Mr. Robertson contends that Centurion delayed care to save money, the only evidence in the record regarding cost savings is NP Hale's statement that the medication she requested was expensive. Dkt. 15 ¶ 71. But that medication was approved and, although it was delayed, there is no evidence that a Centurion policy caused the delay. Next, Mr. Robertson did see several providers during his time at Pendleton but there is no evidence to allow a conclusion that this, alone, caused mistreatment or delays in treatment. Finally, the evidence reflects that Mr. Robertson's medical providers did not order MRIs or other outside treatment based on their medical judgment. There is no evidence that any of the providers requested outside treatment that was denied. And Mr. Robertson has identified no widespread practice by Centurion of denying outside treatment. Even if Mr. Robertson had designated evidence that would allow a conclusion that his providers wrongly denied him outside treatment, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation." *Dean*, 18 F4th at 235.

Because Mr. Robertson has not designated evidence that would allow a jury to conclude that any of his alleged injuries were caused by a policy, custom, or practice by Centurion, Centurion is entitled to summary judgment.

**IV.**
**Conclusion**

The Wexford Defendants' motion for summary judgment, dkt. [155], is **GRANTED IN PART AND DENIED IN PART**. The motion **GRANTED** as to Mr. Robertson's claims against Adoniah Mukona and Wexford and **DENIED** as to his claims against Martial Knieser and Sherri Wilson.

The Centurion Defendants' motion for summary judgment, dkt. [152], is **GRANTED IN PART AND DENIED IN PART**. The motion is granted as to Mr. Robertson's claims against Elizabeth Hale, Carl Kuenzli, Duane Pierce, John Mershon, Missy Bagienski, Angie Reynolds, and Centurion. The motion is **DENIED** as to his claims against Lisa Hamblen.

The **clerk shall terminate** defendants Mukona, Hale, Kuenzli, Pierce, Mershon, Bagienski, Reynolds, Wexford, and Centurion on the docket. The **clerk shall amend** the docket to reflect that Ms. Hamblen's last name is spelled Hamblen.

Finally, the Court notes that the parties were unable to identify a defendant named in Mr. Robertson's complaint as Nurse Shoplanger. The Court takes this opportunity to reconsider its screening order, allowing claims to proceed against this defendant, and Mr. Robertson's statement in his filing at docket 106 stating that Nurse Shoplanger handed him medication on two occasions in early 2021. Mr. Robertson has not sufficiently alleged that Nurse Shoplanger denied him care or was otherwise deliberately indifferent to his serious medical needs. Mr. Robertson shall have **through March 28, 2025,** to show why claims against this defendant should not be dismissed.

Mr. Robertson's motion to appoint counsel and set a settlement conference, dkt. [212], is **GRANTED** to the extent that the Court will seek to recruit counsel to represent him for settlement negotiations and trial. The **clerk shall include** a form motion for assistance with recruiting counsel

with his copy of this Order. Mr. Robertson must fill out, sign, and return this form by **March 28, 2025**, so that the Court can complete the recruitment process.

       IT IS SO ORDERED.

Date: 3/4/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

HERBERT E. ROBERTSON
885415
PLAINFIELD - CF
PLAINFIELD CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel